IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No.  08-cv-00515-PAB-CBS

CELIA RAMIREZ,

      Plaintiff,

v.

THE GEO GROUP, INC., and
JENNIFER BEAUMAN, Individually,

      Defendants.
_____

## ORDER ON MOTION FOR SUMMARY JUDGMENT
_____

      This case is before the Court on defendants' motion for summary judgment

[Docket No. 50].  On August 28, 2009, the Court heard oral argument on the motion.

After consideration of the parties' briefs, arguments, and evidence in the record, the

Court grants the motion in part and denies it in part, as set forth in this order.

## I.  BACKGROUND

      This is an employment discrimination case that requires the Court on summary

judgment to consider whether the plaintiff, Celia Ramirez, was discriminated against on

account of her race or her gender or instead was simply the victim of an unprofessional

co-worker's crude behavior.  Ms. Ramirez, a Hispanic female, worked as a detention

officer for defendant The GEO Group, Inc. ("GEO") at their Aurora I.C.E. Processing

Center in Aurora, Colorado (the "facility") until she was fired in early 2006.  Compl.

[Docket No. 1] at 1 ¶¶ 1-2.  Following her termination, she filed this lawsuit against both

GEO and her former co-worker, defendant Jennifer Beauman, asserting violations of

the federal employment discrimination laws as well as various state law claims.  The following is a brief recitation of the basic facts of this case; more detailed discussions are provided where relevant to the analysis of each individual cause of action.

Ms. Ramirez was hired by GEO in December 2003.  Defs.' Mtn. for Summ. J. [Docket No. 50] ("Defs.' Br.") at 3 ¶ 1; Pl.'s Resp. in Opp. to Mtn. for Summ. J. [Docket No. 56] ("Pl.'s Resp.") at 1 ¶ 1.  Ms. Ramirez, like all GEO detention officers, carried a set of keys to the facility while on duty; the keys were not supposed to leave the facility and were "checked out" at the beginning of each shift.  Defs.' Br. at 4 ¶ 8; Pl.'s Resp. at 3 ¶ 8.  Sometime between July and October of 2005, GEO began using an electronic system called "KeyWatcher" to facilitate the distribution of keys.  Defs.' Br. at 4 ¶ 9; Pl.'s Resp. at 3 ¶ 9.  In order to access KeyWatcher, an employee entered a password and other identifying information into the system.  Defs.' Br. at 5 ¶ 10; Pl.'s Resp. at 3 ¶ 10. The employee followed this same procedure whether checking out a set of keys or returning the keys before a break or at the completion of her shift.  *Id.*

At the beginning of her overnight shift on October 18, 2005, Ms. Ramirez checked out key set # 33 from the KeyWatcher system.  Defs.' Br. at 5 ¶ 13; Pl.'s Resp. at 3 ¶ 13.  At approximately 4:30 a.m. on October 19, Ms. Ramirez checked in those keys in order to take her break and then checked them out again 30 minutes later.  *Id.* However, at the end of her shift, the keys were not logged back into the system.  What happened to those keys is in serious dispute.  Ms. Ramirez contends that she returned the keys as she was exiting the facility around 7 a.m. on October 19. Compl. ¶ 13. According to GEO's investigative report, other witnesses saw Ms. Ramirez apparently returning her keys to the Keywatcher system, but "[n]one of the witnesses could

-2-

positively state they saw [Ms. Ramirez] place key set # 33 into the proper slot."  Pl.'s

Resp., Ex. 20 at GEO 043.  On the afternoon of October 19, the system generated a

"key overdue" alarm indicating that key set # 33 had not been returned.  Defs.' Br. at 6 ¶

18; Pl.'s Resp. at 5 ¶ 18.

     GEO launched an investigation into the disappearance of the keys.  *See, e.g.*,

Pl.'s Resp., Ex. 20.  Ms. Ramirez takes issue with the thoroughness and accuracy of

the investigation, Pl.'s Resp. at 11-12, but it is undisputed that Dawn Ceja, the assistant

facility administrator, prepared a memorandum summarizing her findings about the

incident, concluding that Ms. Ramirez should "be held accountable for losing key set #

33," and recommending that "[s]trong disciplinary action must be considered."  Pl.'s

Resp., Ex. 20 at GEO 044.  In December 2005, the facility's warden, Jerry Alexander,

placed Ms. Ramirez on administrative leave and recommended her termination,

purportedly for the loss of the keys.  Compl. at 5 ¶ 38; Defs.' Br. at 8 ¶ 26.  In January

2006, GEO terminated Ms. Ramirez.  Compl. at 5 ¶ 39; Defs.' Br. at 8 ¶ 27.  Months

later, in September 2006, Ms. Ramirez's keys were found on the roof of the facility.

Defs.' Br. at 8 ¶ 30; Pl.'s Resp. at 9 ¶ 30.

     Ms. Ramirez contends that she was more severely disciplined than other

employees who had committed similar infractions, and that her termination was really

designed to get back at her for reporting inappropriate conduct by Ms. Beauman, who

was also employed as a GEO detention officer.  As far back as June 2004, Ms.

Ramirez complained about Ms. Beauman's harsh, rude, and unprofessional conduct.

Defs.' Br. at 9 ¶ 33; Pl.'s Resp. at 9 ¶ 33.  Although the parties dispute the substance of

Ms. Ramirez's complaints, and specifically whether she reported inappropriate sexual

harassment or just general bad behavior, it is undisputed that Ms. Ramirez's complaints about Ms. Beauman continued throughout Ms. Ramirez's tenure. Defs.' Br. at 9-11; Pl.'s Resp. at 9-10.

In addition, Ms. Ramirez contends that Ms. Beauman herself played a role in the disappearance of the keys.  Ms. Ramirez admits she has no direct proof of Ms. Beauman's involvement, but contends that there is circumstantial evidence.  Defs.' Br. at 9 ¶ 31; Pl.'s Resp, at 9 ¶ 31.  First, Ms. Ramirez notes that Ms. Beauman was in the vicinity of the KeyWatcher system at the time Ms. Ramirez claims she returned her keys.  Pl.'s Resp. at 6 ¶ 19(e).  Second, Ms. Ramirez claims that Ms. Beauman had the motive to get Ms. Ramirez in trouble.  She places a particular focus on an incident that occurred on October 14, 2005 – five days before the loss of the keys.  Compl. at 4 ¶¶ 28-32.  On that day, Ms. Ramirez and Ms. Beauman had an altercation in the facility's control room.  Ms. Ramirez contends that Ms. Beauman slammed open the door to the control room, abruptly shut off the lights to a portion of the facility, and left.  Defs.' Br. at 10 ¶ 36; Pl.'s Resp. at 10 ¶ 36.  Ms. Ramirez claims that she reported this conduct to several of her supervisors.  Defs.' Br. at 10 ¶¶ 36, 39; Pl.'s Resp. at 10 ¶¶ 36, 39.  Another incident a few weeks later further fueled Ms. Ramirez's suspicions regarding Ms. Beauman.  On November 2, 2005, Ms. Ramirez reported that Ms. Beauman was taunting her about the loss of the keys, threatening that "If you don't want your keys to come up missing you better turn them in before I get there."  Defs.' Br. at 10-11 ¶ 40; Pl.'s Resp. at 10 ¶ 40.  Before she was terminated, Ms. Ramirez conveyed to GEO management her belief that Ms. Beauman was involved in the disappearance of key set # 33.  Pl.'s Resp. at 13 ¶ 6.  The parties dispute how seriously GEO investigated these

-4-

reports.  *Id.* at ¶  7; Defs.' Reply to Resp. to Mtn. for Summ. J. [Docket No. 69] ("Defs.'

Reply") at 5 ¶ 7.  In any event, the reports did not change the outcome; as discussed

above, Ms. Ramirez was ultimately found responsible for the loss of the keys and lost

her position as a result.

        Following her termination, Ms. Ramirez filed a complaint against GEO and Ms.

Beauman, asserting federal law claims for discrimination and retaliation in violation of

Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and in violation of 42

U.S.C. § 1981.[1]  Compl. at 9-12.  The gravamen of these claims is that Ms. Beauman

created a hostile and offensive workplace and that, rather than discipline Ms. Beauman,

GEO discriminatorily terminated Ms. Ramirez in retaliation for her constant complaining

about Ms. Beauman's conduct.  Ms. Ramirez also asserts several state-law claims:

breach of contract and promissory estoppel based on GEO's alleged failure to follow

the policies in its employee handbook, *id.* at 5-9; and outrageous conduct and

interference with contract against Ms. Beauman for her alleged role in the key incident,

*id.* at 12-14.

        Defendants moved for summary judgment on all claims.  On August 28, 2009,

the Court held a hearing on that motion.  The motion is fully briefed and ripe for review.

_____

        [1]  In her complaint, Ms. Ramirez also asserted that the discriminatory conduct
violated Colorado's Anti-Discrimination Act, C.R.S. § 24-34-402.  This statute is
essentially the state's counterpart to Title VII.  *See St. Croix v. Univ. of Colo. Health
Sciences Center*, 166 P.3d 230, 236 (Colo. App. 2007).  However, as indicated in the
Final Pretrial Order, Ms. Ramirez has withdrawn this claim.  Final Pretrial Order [Docket
No. 67] at 7.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

### B.  Federal Law Claims

#### 1.  *Discriminatory Discipline*

Ms. Ramirez contends that the discipline she received for her loss of the facility keys – *i.e.*, her termination – was more severe than that meted out to other, similarly situated employees, and that this disparate treatment violated Title VII and 42 U.S.C. § 1981.  Compl. ¶¶ 76-77, 100-101; Final Pretrial Order at 4.  Ms. Ramirez asserts race- and gender-based discrimination.  Final Pretrial Order at 4 ("GEO terminated Ramirez's employment due to illegal race and gender discrimination . . . .").  Title VII protects

against both. *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1156 (10th Cir. 2008).

Section 1981, on the other hand, forbids only discrimination on the basis of race.

*Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 n.3 (10th Cir. 1993) ("[S]ection

1981 does not apply to sex or religious discrimination." (quoting *Manzanares v.*

*Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir.1979))).   Where, as here, there is no

direct evidence of discrimination, both Title VII and Section 1981 claims are analyzed

under the familiar *McDonnell Douglas* burden-shifting framework.  *Randle v. City of*

*Aurora*, 69 F.3d 441, 450-51 (10th Cir. 1995).  Thus, regardless of the specific statutory

source of the claim, the question is whether Ms. Ramirez has met her *McDonnell*

*Douglas* burden at the summary judgment stage.

   The *McDonnell Douglas* analysis proceeds in three distinct steps:

> *McDonnell Douglas* first requires the aggrieved employee to establish a
> prima facie case of prohibited employment action.  The burden of
> establishing a prima facie case by a preponderance of the evidence is not
> onerous.  Furthermore, this burden is one of production, not persuasion; it
> can involve no credibility assessment.  If the employee makes a prima
> facie showing, the burden shifts to the defendant employer to state a
> legitimate, nondiscriminatory reason for its adverse employment action.  If
> the employer meets this burden, then summary judgment is warranted
> unless the employee can show there is a genuine issue of material fact as
> to whether the proffered reasons are pretextual.

*Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citations, quotations, alterations

omitted).  To make out a prima facie case of race-based disparate treatment, a plaintiff

must show that (1) she is a member of a protected class; (2) she suffered an adverse

employment action; and (3) she was treated less favorably than similarly situated

employees not in the protected class.  *See, e.g.*, *Trujillo v. Univ. of Colo. Health Sci.*

*Ctr.,* 157 F.3d 1211, 1215 (10th Cir. 1998) (Title VII claim); *Sydney v. ConMed Elec.*

*Surgery*, 275 F. App'x 748, 751-52 (10th Cir. 2008) (same elements for § 1981 claim).
In the sex-discrimination context, the elements are often articulated as: (1) the victim
belongs to a protected class; (2) she suffered an adverse employment action; and (3)
"the challenged action took place under circumstances giving rise to an inference of
discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).  As in
the race discrimination context, this last element may be met by showing "that the
employer treated similarly situated employees more favorably." *Sorbo v. United Parcel
Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005).  Defendants concede that Ms. Ramirez's
status as a Hispanic woman and her termination from GEO satisfy the first two
elements of the prima facie case.  Defs.' Br. at 13.  It is the third element – whether Ms.
Ramirez was treated less favorably than similarly situated employees – that is in
dispute.  *Id.*[2]

Critical to determining whether Ms. Ramirez was treated differently than "similarly
situated" employees is whether those other employees "violated work rules of
comparable seriousness." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.
1997).  The rules and violations need not be "identical." *Wooten v. Dep't of Treasury*,
1998 WL 339663, *4 (10th Cir. 1998) (citing *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530
(10th Cir. 1995)).  However, "[t]he proponent must show . . . that the incidents he is

---

[2]  "[T]he articulation of a plaintiff's prima facie case may well vary, depending on
the context of the claim and the nature of the adverse employment action alleged."
*Plotke*, 405 F.3d at 1099.  "The critical prima facie inquiry in all cases is whether the
plaintiff has demonstrated that the adverse employment action occurred under
circumstances which give rise to an inference of unlawful discrimination." *Id.* at 1100
(citations and quotations omitted).  However, as the parties debate only the "similarly
situated" element, I focus my analysis on that issue as well.

using for comparison do not involve differentiating or mitigating circumstances that would distinguish them from his own conduct." *Id.* (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)). "'[W]hether two employees are similarly situated ordinarily presents a question of fact for the jury.'" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (ADEA case) (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005) (Title VII case)). But as with all issues of fact, "at summary judgment, the court must determine whether plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Id.* (citations and quotations omitted).

Defendants point out the only other person to have actually *lost* GEO facility keys in the last several years – Mr. Dougharty, an African-American male – was also terminated, and thus argue that Ms. Ramirez cannot prove any differential treatment. Defs.' Br. at 13; *see also id.*, Ex. O at 80:23-81:15. Ms. Ramirez counters that the circumstances surrounding Mr. Dougharty's treatment were "highly distinct" from hers. Pl.'s Resp. at 8-9. She points to the deposition testimony of Warden Alexander that there were "other considerations" in Mr. Dougharty's termination, including his "significant absenteeism," but that there were no other issues taken into consideration when deciding to terminate her. Pl.'s Resp., Ex. 3 at 82:3-23. She further notes Mr. Dougharty's termination memorandum, which lists three reasons, including "Abuse of Sick Leave," as the basis for his termination. Defs.' Br., Ex. R.

Ms. Ramirez also argues that Mr. Dougharty is not the only relevant comparator, and that there were other similarly situated employees who were not given such harsh discipline.  Pl.'s Resp. at 14-15.  She specifically cites two examples of conduct that she contends was similar in seriousness but treated in a much more lenient manner.  First, a Caucasian male who falsified a key count form in August of 2005 was given a five-day unpaid suspension. *Id.*, Ex. 3 at 119:8-21; *see also id.*, Ex. 31.  As Warden Alexander testified, such an action could have impacted facility security because, without an accurate count, "there could have been a key missing."  *Id.*, Ex. 3 at 119:22-120:1. Second, a female officer left her keys hanging, unsecured, in a podium in a detainee dormitory; those keys were later found by the watch commander.  *Id.*, Ex. 3 at 117:23-118:3; *see also id.*, Ex. 32.  The employee was also given a five-day suspension without pay.  *Id.*, Ex. 3 at 118:4-7.  There is some dispute over whether this female officer was Caucasian or Hispanic.  In the deposition testimony cited by Ms. Ramirez, the officer is identified as "Ms. Ledger."  *Id.*, Ex. 3 at 117:14.  No race is identified in either the deposition testimony or the relevant incident report.  Defendants cite to evidence that they contend shows the officer was Hispanic.  Defs.' Br. at 5.  But the evidence is equivocal.  At a deposition, after reviewing the incident report, the following exchange occurred:

Q:     Do you know this person's – what this person's race was?

A:     I believe she was Hispanic.

Q:     Hispanic female, you believe?

A:     Hispanic female, I believe, if I'm remembering correctly.

Pl.'s Br., Ex. 27 at 91:23-92:3.  This testimony does not conclusively establish the officer's race; that issue is one best left for the jury.

Taking all of this evidence together, Ms. Ramirez has made a sufficient showing that she was treated less favorably than similarly situated non-Hispanic employees.  A reasonable jury could find that, given the additional mitigating circumstances surrounding Mr. Dougharty's termination, the two are "distinguishable" and thus Mr. Dougharty should not be viewed as a comparator.  *See Wooten*, 1998 WL 339663 at *4.  A reasonable jury could also find that the two incidents relied on by Ms. Ramirez – falsifying a key report and leaving keys unattended in a detainee dormitory – are violations of "comparable seriousness" to Ms. Ramirez's total loss of keys, as in each circumstance facility security could be similarly compromised.  Under these circumstances, a reasonable jury could find that the difference in sanctions between Ms. Ramirez and these other two officers suggests disparate treatment.  Particularly given that the prima facie burden is not "onerous," *Plotke*, 405 F.3d at 1099, Ms. Ramirez has met it.

Ms. Ramirez has also made out a prima facie case of gender discrimination. Again, a jury could find that she was disciplined more harshly than the male employee who falsified the key count and received only a five-day suspension, and that these two violations were comparable.  Moreover, it is not fatal to Ms. Ramirez's claim that a female officer was also given this relatively lenient discipline.  The Tenth Circuit has warned that "[a] sex discrimination claim does not fail simply because an employer does not discriminate against every member of the plaintiff's sex."  *Strickland v. United Parcel Serv.*, 555 F.3d 1224, 1230 (10th Cir. 2009) (citing *Pitre v. W. Elec. Co.*, 843 F.2d 1262,

1272-73 (10th Cir. 1988)).  In *Strickland*, the plaintiff, a female employee, complained that she was treated less favorably than a male employee whose performance reviews were worse than hers.  555 F.3d at 1230.  However, the office's only other female employee testified that she was not treated any differently from any of the males in the office; this led the district court to conclude that any mistreatment of the plaintiff could not have been due to her sex.  *Id.*  The Tenth Circuit disagreed, holding that even if the other female's treatment was relevant to the employer's discriminatory intent, it did not resolve the issue as a matter of law.  *Id.*  The court found that a jury could infer sex discrimination from the treatment of the plaintiff *vis a vis* the male employee, notwithstanding the fact that the other female employee suffered no such discrimination.  *Id.* at 1230-31; *cf. Pitre*, 843 F.2d at 1272 ("[A]n employer is not immunized from liability simply because some males received detriments before or contemporaneously with a Title VII plaintiff or because other protected classes received benefits instead of a Title VII plaintiff.").  Here, as in *Strickland*, Ms. Ramirez has proffered the critical evidence – evidence that she was treated less favorably than a similarly situated male employee.

Having made out a prima facie case of disparate treatment, the burden then shifts to defendants to articulate a legitimate, non-discriminatory reason for Ms. Ramirez's discipline and discharge.  Like a plaintiff's burden to show a prima facie case, a defendant's burden here is "exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007).

> At this stage of the McDonnell Douglas framework, [defendants] do[ ] not
> need to litigate the merits of the reasoning, nor do[ ] [they] need to prove

> that the reason relied upon was bona fide, nor do[ ] [they] need to prove
> that the reasoning was applied in a nondiscriminatory fashion.  Rather,
> [defendants] need only explain [their] actions against the plaintiff in terms
> that are not facially prohibited by Title VII.

*Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007).  Defendants assert

that they terminated Ms. Ramirez for losing her keys.  Defs.' Br. at 14.  Ms. Ramirez

herself concedes that this was the purported reason for her termination.  Compl. ¶ 38

("On December 14, 2005, Warden Alexander placed Plaintiff on administrative leave

and recommended that she be terminated for the alleged failure to return key set # 33 .

. . .").  Defendants have met their burden on this point.

The onus thus shifts back to Ms. Ramirez to put forth evidence tending to

establish that this proffered explanation is really a pretext to conceal intentional

discrimination.  Importantly, at the summary judgment stage, "a plaintiff generally need

not provide affirmative evidence of discrimination beyond the prima facie case and

evidence that the employer's proffered explanation is pretextual."  *Swackhammer v.*

*Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (citing, *e.g.*, *Doebele v.*

*Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003) ("The plaintiff need

not show both that the defendant's reasons were a pretext and that the real reason was

discrimination - the fact of pretext alone may allow the inference of discrimination."));

*see also Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008) ("To defeat . . .

summary judgment, 'the plaintiff's burden is only to demonstrate a genuine dispute of

material fact as to whether the proffered reasons were unworthy of belief.'" (quoting

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir. 1997))).  "'Pretext can be shown by

such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *PacifiCorp*, 524 F.3d at 1158 (quoting *Morgan*, 108 F.3d at 1323). Although a plaintiff is not limited in her mode of proving pretext, there are two "typical" methods: (1) direct evidence that the stated reason for the adverse employment action is false; or (2) evidence that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness. *Swackhammer*, 493 F.3d at 1167. Disparate treatment of similar employees is "especially relevant" in the pretext inquiry. *PacifiCorp*, 524 F.3d at 1158.

Ms. Ramirez seeks to show pretext through both of the "typical" methods. First, she points to evidence that she contends directly proves that the given reason for her termination is false and that she was really terminated for her raft of complaints to management. Pl.'s Resp. at 8. Specifically, she cites her own deposition testimony, in which she asserted that "a field training officer – he is also a black male. I can't think of his name. He told Officer Greutzmacher soon after this incident that if I would have kept my mouth shut, I would still have a job." *Id.*, Ex. 1 at 133:3-7. She also cites the testimony of Robert Leger, a GEO employee, who stated that he overheard a similar story:

> I remember Anderson was talking with one of the nurses. We were all in [the lounge after a management meeting]. And he goes – he says, "If it would have been any other employee but Ramirez, they would have kept their job, but because Ramirez was so argumentative with the warden, this is their way to get rid of her."

*Id.*, Ex. 6 at 69:6-12.  Mr. Leger reiterated this point later in his deposition, recalling again

> when Anderson was talking in the lounge to everybody about what happened, saying that Ms. Ramirez was very argumentative with the – with Warden Alexander, and if she wouldn't have been so argumentative, she wouldn't have lost her job.  And if it would have been anybody else, they probably wouldn't have lost their job.  So, everybody said, okay, she argued, so she lost her job.

*Id.* at 103:19-25.

The problem with both pieces of deposition testimony is that they are, on their face, hearsay.  The purpose of the testimony is to show what the field training officer and "Anderson" said about Ms. Ramirez's termination.  But neither the field training officer nor "Anderson" have submitted affidavits or their own deposition testimony. Other witnesses' recollections of what they said do not pass muster.  *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) ("Hearsay testimony cannot be considered [on summary judgment] because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'"  (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995))).

At the summary judgment hearing, Ms. Ramirez's counsel suggested that these statements were admissible statements of a party opponent.  Pursuant to Fed. R. Evid. 801(d)(2)(D), a statement is not hearsay if it is offered against a party (which the statements here are) and if the declarant is "the party's agent or servant" and the statement "concern[s] a matter within the scope of the agency or employment." Importantly, "[i]nquiries relating to an agency or employment relationship and its scope must be treated as preliminary questions to be established     . . . by a preponderance

-15-

of the evidence under Rule 104(a)."  5 Weinstein's Federal Evidence § 801.33[2][a].

Ms. Ramirez points to no evidence to show that either the field training officer or

"Anderson" were sufficiently involved in the deliberations concerning Ms. Ramirez's

termination to vest them with the requisite authority for the purpose of Rule 801(d)(2).

*See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) ("In order for

a statement to qualify as an admission of a party opponent, the speaker 'must be

involved in the decisionmaking process affecting the employment action involved.'"

(quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003))).[3]  As

their statements are hearsay, those statements may not inform my decision on

summary judgment.

---

[3]  Although not cited by Ramirez, Mr. Leger's deposition does contain this description of Anderson's role in the deliberative process:

> Q:    And what was Mr. Anderson's involvement in the investigation?
>
> A:    He was just kind of in the know.  He was kind of, in a way, kind of – he did everything in the facility.  He was part training, part – he just did everything.  And he was just a guy that they relied on.  And he was in the meetings, warden's meetings.  And he was just in the know type of thing.
>
> Q:    What information do you have about Andy Anderson's involvement in the investigation, if any?
>
> A:    He just told everybody what happened, so we all presumed he was part of it, or somebody higher up told him what happened, because he knew what happened.

Pl.'s Resp., Ex. 6 at 104:1-13.  This evidence shows, at best, that Anderson was "in the know," not that he was *"involved in the decisionmaking process"* as required by *Jaramillo*.  427 F.3d at 1314.

As noted above, however, Ramirez also points to evidence that she was treated differently than other, similarly situated employees of a different race or gender.  Those other employees were subject to drastically different discipline – five-day suspensions, rather than termination – for actions that could be viewed as posing the same or similar security concerns as Ms. Ramirez's loss of keys.  Heeding the Tenth Circuit's guidance that disparate treatment is "especially relevant" to the pretext analysis, *PacifiCorp*, 524 F.3d at 1158, I find that this evidence is sufficient for Ms. Ramirez to survive summary judgment.  It is for the jury, not this Court, to decide whether Ms. Ramirez's claim ultimately prevails.[4]

### 2.  Hostile Work Environment

Ms. Ramirez also contends that Ms. Beauman created an impermissibly hostile work environment, again in violation of Title VII and Section 1981.  Final Pretrial Order at 2.  As a threshold matter, defendants dispute that Ms. Ramirez has adequately asserted such a claim.  Defs.' Reply at 8.  Although not a model of clarity, Ms. Ramirez's complaint does indicate her concerns with the environment created by Ms. Beauman.  *See* Compl. ¶ 30 ("Plaintiff reported to [superiors] that Beauman had used crude and sexually hostile and offensive language in the presence of others, in violation

---

[4] Ms. Ramirez puts a particular focus on her argument that her termination was in retaliation for complaints about a hostile work environment.  As discussed below, however, neither her retaliation claim nor her hostile work environment claim survive summary judgment.  But that conclusion is not inconsistent with the Court's ruling here that she has presented sufficient evidence of disparate treatment to present that claim to a jury.  Particularly given the disparity in discipline between Ms. Ramirez and the other two non-Hispanic employees, a jury could find that even if GEO was not illegally retaliating against her for complaining about a sexually- or racially-hostile work environment, she was still terminated (rather than given more lenient discipline) simply on account of her race or gender.

of GEO policy."); ¶ 75 ("Beauman . . . engaged in crude and sexually hostile and offensive conduct and otherwise violated GEO policy.").  Further, Ms. Ramirez expressly included the claim in the Final Pretrial Order, which, per its terms, "control[s] the subsequent course of this action and the trial."  *See* Final Pretrial Order at 2, 24. Indeed, defendants themselves asserted, in the Final Pretrial Order, an affirmative defense that they took reasonable care to address "any discriminatory or retaliatory behavior *or hostile or offensive work environment*."  *Id.* at 10 (emphasis added).  Under these circumstances, I construe Ms. Ramirez's pleadings to raise a hostile work environment claim.

"The elements of a hostile work environment claim under § 1981 are the same as those under Title VII."  *Tademy*, 520 F.3d at 1170 (quotations and alterations omitted).  In order to prove a hostile work environment, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *PVNF*, 487 F.3d at 798 (gender discrimination); *see also Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (race discrimination).  Moreover, the work atmosphere matters: in a rough-and-tumble work environment like a detention facility, crude language is less likely to rise to the level of illegally hostile or offensive.  *See, e.g.*, *Gross*, 53 F.3d at 1538 ("[W]e must evaluate [the] claim of gender discrimination in the context of a blue collar environment where crude language is commonly used . . . . Speech that might be offensive or

unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments.").

In order for conduct to be "severe and pervasive," there must be more than a few isolated incidents of racial or gender animus.  Cases typically require a "steady barrage of opprobrious . . . comments."  *Herrera*, 474 F.3d at 680.  However, the pervasiveness of conduct is "particularly unsuited for summary judgment because it is quintessentially a question of fact."  *Id.*

A plaintiff must also show that she was targeted because of her race, gender, or national origin.  Not all of the allegedly harassing conduct need be specifically race- or gender-based.  Conduct that seems "neutral in isolation" may in fact be motivated by discriminatory animus, but that motivation may become clear only when viewed in the context of other, race- or gender-based behavior.

> Thus, when a plaintiff introduces evidence of both race- [or gender-]based and race- [or gender-]neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct as the product of racial [or gender] hostility, then it is for the fact finder to decide whether such an inference should be drawn.

*Herrera*, 474 F.3d at 682 n.7 (alterations omitted); *see also Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (gender discrimination).  Even so, a court must always bear in mind that the federal employment discrimination statutes do not establish "a general civility code for the American workplace," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), and therefore the key inquiry is not whether the employee was subject to an unpleasant workplace, but rather whether the hostile environment was due to the employee's race or gender.  *Gross*, 53 F.3d at 1537 ("If the

-19-

nature of an employee's environment, however unpleasant, is *not due to her gender*, she has *not* been the victim of sex discrimination as a result of that environment." (citations and quotations omitted) (emphasis in original)); *Shoate v. U.S. Postal Serv.*, 1999 WL 166090, *2 (10th Cir. 1999) (no hostile work environment claim where "the nature of plaintiff's working environment, no matter how unpleasant and demeaning, was not due to her race" (citing *Univ. of Colo. Health Sci. Ctr.*, 157 F.3d at 1214)).

In her response to defendants' summary judgment motion, Ms. Ramirez catalogs Ms. Beauman's allegedly harassing and abusive conduct .  Some of this evidence is irrelevant.  For example, harassment of which the plaintiff is not aware cannot make out a hostile environment claim.  *See, e.g.*, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 (10th Cir. 2007).  Thus, evidence concerning other employees' recollections of Ms. Beauman's use of foul language, where there is no suggestion that Ms. Ramirez overheard the language, cannot support her claim.  *See* Pl.'s Resp. at 15-16 (¶ 17(b)). Similarly, testimony that one employee, Ms. Prieto, complained to another employee, Mr. Burton, that Ms. Beauman had joked that Mr. Burton had gotten Ms. Prieto pregnant, has no place in the analysis.  *Id.* at 16 (¶ 17(d)).  In the same vein, "vague and conclusory" allegations of discrimination are insufficient to defeat summary judgment.  *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000).  Ms. Ramirez's testimony to the effect that Ms. Beauman "had issues" with Hispanic females is therefore too general to support a hostile environment claim.  Pl.'s Resp., Ex. 1 at 43:8-15.

The conduct that is sufficiently particularized and was observed or overheard by Ms. Ramirez falls into three categories.  The first is evidence that Ms. Beauman was

hostile and aggressive toward Ms. Ramirez: slamming doors, cursing, hanging up the phone, and taunting Ms. Ramirez about the loss of her keys.  Pl.'s Resp. at 16 (¶ 17(c)).  The second category is evidence of sexual remarks and jokes that Ms. Ramirez overheard.  *Id.* at 15 (¶ 17(a)).  This includes a joke Ms. Beauman shared with "the guys" about oral sex.  *See id.*, Ex. 1 at 41:10-15.  Mr. Burton also relayed to Ms. Ramirez that he overheard Ms. Beauman mock someone who was speaking over the radio, saying "that person needs to take their dick out of their mouth because you can't hear them."  *Id.*, Ex. 15 at 32:13-33:7, 36:14-15.  Ms. Ramirez testified that she "didn't stick around" for these kinds of jokes, *id.*, Ex. 1 at 10, and that the comments "were not necessarily directed at her, but were made in front of her," Pl.'s Resp. at 11.  The final category consists of testimony that other Hispanic employees, and specifically Ms. Prieto and Ms. Lopez, were harassed by Ms. Beauman.  *Id.* at 16 (¶ 17(d), (e)).  Ms. Ramirez states that Ms. Prieto complained that Ms. Beauman "was rude to her, would slam doors in her face, would take a longer time to open doors," would "snicker" when Ms. Prieto walked by, and once commented that Ms. Prieto was "walking like she had a dick up her ass."  *Id.*, Ex. 2 at 3.[5]  Ms. Lopez similarly informed Ms. Ramirez that Ms. Beauman was harassing her and that she had complained to the warden about it.  *Id.*[6]

---

[5]  Mr. Burton recalled a similar comment, and passed the comment along to Ms. Ramirez.  Pl.'s Resp., Ex. 15 at 38:18-39:12.  Mr. Burton testified that the comment was "about Ms. Prieto having a stick up her butt."  *Id.*

[6]  Contrary to defendants' suggestion, the fact that some of this conduct was not directed at Ms. Ramirez does not make the conduct irrelevant to the assessment of her claim.  "[B]ecause one of the critical inquiries in this claim is the environment, 'incidents of sexual harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's claim of a hostile work environment.'"  *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994) (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d

Assuming for the sake of argument that the above conduct is pervasive, Ms. Ramirez's claim fails for the simple reason that no reasonable jury could find that the "hostile environment" was in any way related to Ms. Ramirez's race or gender.  Ms. Beauman's conduct is best described as crude and unprofessional, not racially or sexually discriminatory.  Even the sex-themed jokes and comments, which could, under certain circumstances, support a discrimination claim, *see Miller v. Regents of Univ. of Colo.*, 1999 WL 506520, *9 (10th Cir. 1999), do not do so here.  There is no evidence that the reason Ms. Beauman made those remarks was because Ms. Beauman was targeting Ms. Ramirez on account of her being Hispanic or a woman.   *Gross*, 53 F.3d at 1537; *Shoate*, 1999 WL 166090, at *2.  Summary judgment in defendants' favor is appropriate on this claim.

### 3.  Retaliation

As her final federal law claim, Ms. Ramirez alleges that she was fired in retaliation for her complaining about conduct – and specifically sexual harassment – prohibited by Title VII.  *See* Compl. at 10.  Like her hostile work environment claim, this claim focuses on Ms. Beauman's conduct.  Ms. Ramirez contends she complained to management about Ms. Beauman's "crude and sexually hostile and offensive conduct" and was eventually terminated for these complaints.  *Id.*

A prima facie case of retaliation requires a plaintiff to show

"(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."

---

1406, 1413 (10th Cir. 1987)).

*Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).  Defendants focus their challenge on the first and third elements of the claim.

As to the first element, protected opposition to discrimination, defendants contend that there is no evidence that Ms. Ramirez ever mentioned sexual discrimination when raising issues about Ms. Beauman.  *See, e.g.*, *Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002) ("The purpose of [the anti-retaliation provision] is to let employees feel free to express condemnation of discrimination that violates Title VII.  That purpose is hardly served by imposing sanctions upon employers who take action against employees who never communicate their concern about unlawful discrimination.").  Ms. Ramirez disagrees, pointing to evidence of several discreet complaints she made to management.  Pl.'s Resp. at 16-17.  She notes that in November 2004 she complained to a corporate investigator, Ms. Duffle, about Ms. Beauman's generally harassing conduct, and that she is "sure" she mentioned Ms. Beauman's sexual jokes.  *Id.* at 16 (¶ 18(a)); *see also id.*, Ex. 1 at 34:16-41:24.  She also cites a June 2004 complaint to the facility's warden that Ms. Beauman was "very harsh to people.  Was very rude and unprofessional.  And I had my concerns about working with her."  Pl.'s Resp. at 16 (¶ 18(b)); *see also id.*, Ex. 1 at 39:20-40:1.  She further contends that she "complained verbally to Captain Harrison on numerous occasions."  Pl.'s Resp. at 17 (¶ 18(c)).  These complaints were typically about Ms. Beauman's rude and unprofessional demeanor, but she does note that, as with Ms. Duffle, she is "sure" that she spoke to Captain Harrison about the sexual jokes.  *Id.*, Ex.

1 at 41:10-24.  She also points to complaints made to Captain Evans and Watch Commander Rowlett, again reporting generally rude and abusive behavior such as slamming doors, hanging up phones, use of profanity, and Ms. Beauman's overall lack of professionalism.  Pl.'s Resp. at 17 (¶ 18(d), (e)).  She does note that she complained to Captain Evans about the "hostile work environment."  *Id.*, Ex. 1 at 29:20-25.  Ms. Ramirez also cites to two reports that she filed, one in October 2005 and one in November 2005, relating to Ms. Beauman.  *Id.* at 17 (¶ 18(f), (g)).  The October report concerned the incident in the control room where Ms. Beauman was pushing on the control room door and "slammed down" the lights.  *Id.*, Ex. 23.  The November report focused on Ms. Beauman's taunting Ms. Ramirez about her loss of the keys.  *Id.*, Ex. 24.  Finally, although not cited by Ms. Ramirez, the Court's review of the record reveals an additional complaint: Ms. Ramirez testified at her deposition that, in August of 2005, she complained to the warden about Ms. Beauman's "hostile work environment [and] her sexual comments."  Pl.'s Resp., Ex. 1 at 207:4-12.

The problem with most of these complaints is similar to the flaw in Ms. Ramirez's hostile work environment claim: the complaints may have been precise and repeated, but they are not about conduct protected by Title VII.  While a plaintiff need not use "magic words" in describing the objectionable conduct, she must still convey her concern that the offender is engaging in a practice prohibited by the employment statutes.  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  Complaints that Ms. Beauman was crude, aggressive, slammed doors, and used foul language did not give GEO management sufficient notice that Ms. Ramirez was concerned with unlawful sexual harassment.

There are, however, a few complaints that could, perhaps, be read to fall under the guise of reporting sexual harassment: (1) the complaint to Ms. Duffle about Ms. Beauman's sexual jokes; (2) the similar complaint to Captain Harrison; (3) the statement to Captain Evans about the "hostile work environment"; and (4) the complaint to the warden about Ms. Beauman's "sexual comments."[7]  But even assuming that these complaints could be construed to give GEO adequate notice that Ms. Ramirez was engaged in "protected opposition to discrimination," those complaints would still fail to raise a triable issue of fact on Ms. Ramirez's retaliation claim, as she has failed to establish the requisite connection between the complaints and her termination.

As defendants note, the third element of the prima facie case requires Ms. Ramirez to establish a "causal connection" between the protected activity (the complaints) and the adverse action (the termination).  A plaintiff may show this connection in one of two ways.  First, she may show "temporal proximity" between the activity and the adverse action.  *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).  "[I]f the only evidence of causation is a temporal relationship, then the adverse action must occur closely following the protected activity."  *Id.*  For example, the Tenth Circuit has held that a three-month gap is too great to permit a presumption of causation.  *Id.*  Second, if the activity and adverse action are not "*very closely connected in time . . .* , the plaintiff must rely on additional evidence beyond temporal

_____

[7]  Although, as discussed above, this underlying conduct did not actually create a hostile work environment, that fact would not necessarily preclude Ms. Ramirez's retaliation claim so long as she reasonably believed the conduct was illegal.  *See, e.g.*, *Bd. of County Comm'rs v. E.E.O.C.,* 405 F.3d 840, 852 (10th Cir. 2005) ("Title VII permits employees to maintain retaliation claims based on a reasonable good-faith belief that the underlying conduct violated Title VII.").

proximity to establish causation." *Id.* (emphasis in original).  That is, "the passage of time does not necessarily bar a plaintiff's retaliation claim if *additional* evidence establishes the retaliatory motive." *Id.* at 1198-99 (emphasis in original).

In her response to defendants' statement of facts, Ms. Ramirez argues that she has evidence to show she was terminated "because of her complaints to managers, including her repeated complaints about the hostile work environment created by Jennifer Beauman." Pl.'s Resp. at 8.  This could qualify as the "additional evidence" of a causal connection between her complaints and her termination that would obviate the need for temporal proximity.  However, the evidence relied on to support this argument is the third-party statements of the "field training officer" and "Anderson" that, as discussed above, are inadmissible hearsay.

Thus, Ms. Ramirez must show a close temporal connection between the complaints and her termination, which was recommended in December 2005 and effectuated in January 2006.  She clearly cannot do so with respect to the complaints made to Ms. Duffle and the warden.  The statement to Ms. Duffle occurred in November 2004 – more than a year prior.  And the complaint to the warden was made in August 2005, four to five months before the adverse action.  These gaps are simply too large to permit an inference of causation.  *Piercy*, 480 F.3d at 1198.

Ms. Ramirez could not recall the dates of her complaints to Captains Evans and Harrison, with the exception of her complaint to both following the October 2005 control room incident.  *See* Defs.' Br. at 10; Pl.'s Resp. at 10.  There is no indication that she raised the issue of the sexual joke, with respect to Captain Harrison, or the "hostile work

environment," with respect to Captain Evans, at that time.  *See* Pl.'s Resp., Ex. 1 at 29:20-30:13, 41:10-24.  But even assuming that she did, and even accepting that the two- to three-month delay between these complaints and her termination could be sufficient to show temporal proximity, *see Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171-72 (10th Cir. 2006) (six-week delay sufficient to show causal connection), this evidence is still insufficient to make out a prima facie case of retaliation.  The Tenth Circuit has held that a plaintiff "must show that the individual who took adverse action against him knew of the employee's protected activity."  *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).  Ms. Ramirez fails to provide any evidence that Warden Alexander, who recommended termination, or the GEO management, who concurred with the decision, were aware of the protected conduct – the specific complaints about sexual jokes or a "hostile work environment."

For all of these reasons, Ms. Ramirez has failed to raise any genuine dispute over whether her termination was in retaliation for protected conduct.  Summary judgment in defendants' favor is appropriate on this claim.

### C.   State Law Claims

#### 1.   Breach of Implied Contract/Promissory Estoppel

Ms. Ramirez asserts related claims for breach of implied contract and for promissory estoppel, both grounded in allegations that GEO violated policies contained in its employee handbook.  *See* Compl. at 5-9; Final Pretrial Order at 5-6.  Specifically, Ms. Ramirez contends that GEO failed to enforce its policies barring race or gender discrimination and failed to properly and uniformly apply its disciplinary policy.  *Id.*

Defendants argue that the handbook contained disclaimers indicating that it did not create any sort of binding contract or otherwise alter GEO employee's basic "at will" employment relationship with the company.  Defs.' Br. at 20-22.  Statements made in an employee handbook – for example, statements limiting the employer's right to discharge its employees – can alter the presumed "at will" status of employees and give rise to a contract-type claim.  *Evenson v. Colo. Farm Bur. Mut. Ins. Co.*, 879 P.2d 402, 408 (Colo. App. 1993).  However, if the handbook expressly disclaims any intent to form a contractual relationship, an implied contract or estoppel claim fails as a matter of law. This is because

> [w]hen an employment manual contains an appropriate disclaimer, no implied contract can be formed because the disclaimer precludes the possibility of a manifestation of assent by the employer. . . . Similarly, a promissory estoppel claim cannot succeed because an effective disclaimer precludes the possibility that any reliance by the employee could be reasonable or justified.

1B Colo. Prac. § 19.7.  To be sufficient, the disclaimer must be "clear and conspicuous."  *See, e.g.*, *Ferrera v. Nielsen*, 799 P.2d 458, 460-61 (Colo. App. 1990) ("Summary judgment denying claims based on a handbook is appropriate if the employer has clearly and conspicuously disclaimed intent to enter a contract . . . .").  "Whether a contract disclaimer in a handbook is clear and conspicuous is a question of law."  *Fejes v. Gilpin Ventures, Inc.*, 960 F. Supp. 1487, 1495 (D. Colo. 1997).

Defendants rely on two specific provisions of the handbook which, they contend, disclaim any contractual intent.  First, the handbook contains the following statement, which Ms. Ramirez signed:

## RECEIPT FOR EMPLOYEE HANDBOOK

I acknowledge that I have received a copy of The GEO Group, Inc. Employee Handbook.  I agree to read it thoroughly, including the statements in the foreword describing the purpose and effect of the Handbook.  I agree that if there is any policy or provision in the Handbook that I do not understand, I will seek clarification from the Human Resources Department.  I understand that GEO is an "at will" employer and as such, employment with GEO is not for a fixed term or definite period and may be terminated at the will of either party, with or without cause, and without prior notice.  No supervisor or other representative of the company (except the Chairman/CEO or Vice Chairman/President) has the authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the above.  In addition, I understand that this Handbook states GEO's policies and practices effective on the date of publication.  I understand that nothing contained in the Handbook may be construed as creating a promise of future benefits or a binding contract with GEO for benefits or for any other purpose.  I also understand that these policies and procedures are continually evaluated and may be amended, modified or terminated at any time.

Defs.' Br., Ex. C at GEO 002.  In addition, the handbook contains the following

"foreword":

## FOREWORD

Whether you have just joined our staff or have been with The GEO Group, Inc. (GEO) for a while, we are confident that you will find our company a dynamic and rewarding place in which to work and we look forward to a productive and successful relationship.  We consider the employees of GEO to be one of its most valuable resources.  This manual has been written to serve as the guide for the employer/employee relationship.

There are several things that are important to keep in mind about this handbook.

First, it contains only general information and guidelines.  It is not intended to be comprehensive or to address all the possible applications of, or exceptions to, the general policies and procedures described.  For that reason, if you have any questions concerning eligibility for a particular benefit, or the applicability of a policy or practice to you, contact the Human Resources Department.  Neither this handbook, nor any other Company document confers any contractual right, either express or

> implied, to remain in the Company's employ.  Nor does it guarantee any
> fixed terms or conditions of your employment. . . .

*Id.* at GEO 003.

As a threshold matter, Ms. Ramirez contends that she did not read the receipt before she signed it "[b]ecause they handed it to me and told me sign here to claim that – to say that you got the handbook."  Pl.'s Resp., Ex. 1 at 102:19-24.  But the receipt does not say an employee has read the handbook before she signs the receipt; rather, it states simply that the employee "received a copy" of the handbook and *"agree[d] to read it thoroughly*."  (Emphasis added).  Ms. Ramirez admits that she received an employee handbook when hired.  Defs.' Br., Ex. A at 7:11-13; *see also* Compl. at 7, 8 (¶¶ 54, 66).  She does not contend that she did not have an opportunity to read the handbook.  Defs.' Br., Ex. A at 103:7-104:7.  There is no evidence to suggest she was told not to read the handbook after receiving it.  Moreover, she expressly acknowledges being aware of at least certain handbook policies during her employment.  Compl. at 7, 8 (¶¶ 54, 66).  Under these circumstances, failure to read the receipt does not negate the handbook's disclaimers.  *Cf. Breaux v. Am. Family Mut. Ins. Co.*, 387 F. Supp. 2d 1154, 1162 (D. Colo. 2005) ("It is a fundamental principle of law that, absent fraud or concealment, a person who signs a document is presumed to have knowledge of the document's contents, independent of whether that person has read the document.").

The question, then, is whether the handbook has "clearly and conspicuously" disclaimed GEO's intent to be bound.  I find that it has.  The receipt states that "I understand that nothing contained in the Handbook may be construed as creating a promise of future benefits or a binding contract with GEO for benefits or for any other

purpose."  Moreover, the receipt expressly prompts the employee to read the foreword.

Defs.' Br., Ex. C at GEO 002 ("I agree to read [the handbook] thoroughly, including the

statements in the foreword describing the purpose and effect of the Handbook.").  The

foreword, in turn, notes "several things that are important to keep in mind about this

handbook," including that "[n]either this handbook, nor any other Company document

confers any contractual right, either express or implied, to remain in the Company's

employ.  Nor does it guarantee any fixed terms or conditions of your employment."

These disclaimers are in line with the types of disclaimers that Colorado courts have

found sufficient to defeat implied contract or promissory estoppel claims.  *See Ferrera*,

799 P.2d at 461 (disclaimer on first page of handbook labeled "IMPORTANT" coupled

with signed acknowledgment was "clear and conspicuous"); *Healion v. Great-West Life*

*Assur. Co.*, 830 F. Supp. 1372, 1375 (D. Colo. 1993) (disclaimer on last page of

preface of handbook in section entitled "About Your Handbook" coupled with signed

acknowledgment was "clear and conspicuous").

      At the summary judgment hearing, Ms. Ramirez also argued that there were

numerous verbal promises made to her by management during the investigation that

she had nothing to worry about and that everything would be fine.  *See also* Pl.'s Resp.

at 13 (evidence that during the investigation, a number of GEO employees told her not

to worry, that things would "work[ ] out" and that GEO would "get it figured out")  This is

presumably an argument that these statements somehow "trumped" the disclaimer and

guaranteed her continued employment.  It is true that a specific oral promise may

modify an express agreement.  *See Fair v. Red Lion Inn*, 920 P.2d 820, 826 (Colo. App.

1995).  However, "vague assurances" will not suffice.  *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1465 (10th Cir. 1994).  The alleged statements are precisely that – vague assurances not to worry – and for that reason cannot form an enforceable contract.

Given the clear and conspicuous disclaimers in the employee handbook, summary judgment on Ms. Ramirez's breach of contract and promissory estoppel claims is appropriate.

### 2.  Outrageous Conduct

Ms. Ramirez's final two state law claims are against Ms. Beauman individually. Ms. Ramirez first asserts a state-law claim for "outrageous conduct," based on Ms. Beauman's alleged role in the loss of Ms. Ramirez's keys and Ms. Ramirez's resultant termination.  *See* Compl. at 12-13; Final Pretrial Order at 6-7.

In order to prove outrageous conduct, Ms. Beauman's actions must be

so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (citing *Rugg v. McCarty*, 476 P.2d 753, 756 (1970)).  Although "the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994); *see also Bauer v. Southwest Denver Mental Health Center, Inc.*, 701 P.2d 114, 118 (Colo. App. 1985)

("The trial court must determine, as a threshold matter of law, whether the defendant's alleged conduct was sufficiently heinous to create a submissible claim.  If, after viewing the evidence in the light most favorable to plaintiff, the court determines that no reasonable person could conclude that the defendant's conduct was outrageous, summary judgment is appropriate.").

Defendants' primary contention is that there is no evidence that Ms. Beauman actually took Ms. Ramirez's keys from the KeyWatcher system – the premise of Ms. Ramirez's claim – and thus the claim should not be permitted to go to the jury.  A distinction needs to be made, however, between causation and the screening a court performs under *Culpepper*.  The screening question is not whether Ms. Beauman really did cause the disappearance of Ms. Ramirez's keys, but whether the "alleged conduct [is] sufficiently heinous to create a submissible claim."  *Bauer*, 701 P.2d at 118.  As discussed above, there is circumstantial evidence of Beauman's involvement in the loss of the keys: Ms. Beauman's aggressive behavior toward Ms. Ramirez during their altercation in the control room a few days before the key incident;  Ms. Beauman's presence near the KeyWatcher system at the same time as Ms. Ramirez; and Ms. Beauman's taunt to Ms. Ramirez a few weeks after the key incident that "If you don't want your keys to come up missing you better turn them in before I get there."  *See infra* at 4-5.  Viewing the evidence in Ms. Ramirez's favor, a jury could conclude that Ms. Beauman had sufficient motive and opportunity to sabotage Ms. Ramirez's employment.  Further, a jury could find that Ms. Beauman removed the keys after Ms. Ramirez returned them and threw those keys on the roof, knowing that Ms. Ramirez would be held accountable for their loss, and that Ms. Beauman stood idly by while Ms.

Ramirez was investigated, suspended, and fired.  At the summary judgment stage, the issue is not whether this behavior meets the admittedly stringent Colorado standard for outrageous conduct.  Rather, the issue is whether reasonable people could differ on that question.  *Culpepper*, 877 P.2d at 883.  I find that they could.  *Cf. Barham v. Scalia*, 928 P.2d 1381, 1386 (Colo. App. 1996) (allegations sufficient to state an outrageous conduct claim where plaintiff alleged his employer had strong dislike for him and took specific actions to deny him a fair termination hearing).  Summary judgment on this claim is therefore inappropriate.

### 3. Intentional Interference with Contract

Ms. Ramirez's final claim focuses again on Ms. Beauman's alleged involvement in the key incident and charges that such action intentionally interfered with Ms. Ramirez's employment contract with GEO.  Compl. at 13; Final Pretrial Order at 7.

Colorado law recognizes that a non-party to a contract may be liable for interference with the performance of that contract.  *See, e.g.*, *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984).  In *Memorial Gardens*, the Colorado Supreme Court cited with approval the following definition of the tort:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Id.* at 210 (quoting Restatement (Second) of Torts § 766 (1977)).

Defendants attack this claim on several fronts.  First, they argue that there is no evidence that Ms. Beauman played any role in the loss of Ms. Ramirez's keys, by which they presumably mean there is no evidence of intentional or improper conduct.  Defs.' Br. at 24.  However, as explained above, there is sufficient circumstantial evidence from which a jury could conclude that Ms. Beauman was involved.  The fact that Ms. Ramirez's keys were found on the roof of the GEO facility is powerful evidence that someone other than Ms. Ramirez threw them there and that such person intended to get Ms. Ramirez in trouble for their loss.  If Ms. Ramirez's theory pans out at trial, Ms. Beauman's actions could well be considered both intentional and improper.

Defendants also contend that there was no contract between Ms. Ramirez and GEO with which Ms. Beauman could interfere.  Defs.' Br. at 25.  However, while the employee handbook may not have formed any enforceable contractual rights, Ms. Ramirez's relationship with GEO did create an employment contract, albeit one that was "at will" and terminable by either party at any time.  *See, e.g.*, *Middlemist v. BDO Seidman, LLP*, 958 P.2d 486, 493 (Colo. App. 1997) ("In general, employment contracts are at-will and either the employer or the employee may terminate the relationship at any time . . . .").  Just because the parties to the contract could end the employment relationship at any time does not absolve a third party from liability where she wrongfully induces the termination of that same relationship:

> The parties to an employment-at-will contract may terminate the
> employment without cause or notice; therefore, an employee does not
> have a legitimate claim of entitlement to continued employment against
> the employer.  However, a contract terminable at will is entitled to
> protection from tortious unwarranted interference from third parties, and
> until terminated, an at-will contract is valid and subsisting, and a stranger
> to the contract has no right to interfere improperly with it.

*Bithell v. W. Care Corp.*, 762 P.2d 708, 712-13 (Colo. App. 1988) (citations omitted); *see also Mem'l Gardens*, 690 P.2d at 211 & n.8 (noting that, while contracts terminable at will are entitled to "less protection" than typical contracts guaranteeing future performance, "even a contract terminable at will is entitled to some protection from tortious unwanted interference").  Ms. Ramirez's "valid and subsisting" at-will employment contract is sufficient to support her claim for tortious interference.

Lastly, defendants argue that there is no evidence that Ms. Beauman knew of the employment agreement between Ms. Ramirez and GEO.  Defs.' Br. at 25. Defendants are correct that proof of the tort requires that the interferer be aware of the contractual relationship with which she is interfering.  *See, e.g.*, *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004).  However, "actual knowledge is not required to prove intentional interference with contract.  Rather, a plaintiff must show that the defendant had knowledge of facts which would lead him to inquire as to the existence of the contract."  *Galleria Towers, Inc. v. Crump Warren & Sommer, Inc.*, 831 P.2d 908, 912 (Colo. App. 1991).  Ms. Beauman and Ms. Ramirez were co-workers. Even if that relationship did not give Ms. Beauman actual knowledge that Ms. Ramirez had the same at-will employment contract with GEO that Ms. Beauman did, it certainly put Ms. Beauman on notice that such a contract might exist.

For these reasons, it is for a jury to decide whether Ms. Beauman intentionally interfered with the employment relationship between Ms. Ramirez and GEO.

### III.  CONCLUSION

Accordingly, it is

**ORDERED** that defendants' motion for summary judgment [Docket No. 50] is GRANTED in part and DENIED in part.  Summary judgment is GRANTED on Celia Ramirez's claims for illegal retaliation, hostile work environment, breach of implied contract, and promissory estoppel.  Those claims are dismissed with prejudice. Summary judgment is DENIED on Celia Ramirez's claims for disparate treatment, outrageous conduct, and intentional interference with contract.  A trial on those claims is set to commence on September 28, 2009.

DATED September 4, 2009.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge